WEBER AIRCRAFT CORPORATION, A DIVISION OF WALTER KIDDE and COMPANY, INC., and Mills Manufacturing Corporation, Plaintiffs-Appellants,

v.

UNITED STATES of America, Defendant-Appellee.

No. 80–5744.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Nov. 27, 1981.

Decided Sept. 21, 1982.

Rehearing and Rehearing En Banc Denied Dec. 3, 1982.

Marshall Silberberg, Kirtland & Packard, Lawrence J. Galardi, Los Angeles, Cal., for plaintiffs-appellants.

Volney V. Brown, Asst. U.S. Atty., Los Angeles, Cal., for defendant-appellee.

Before CANBY and NORRIS, Circuit Judges, and SMITH,* District Judge.

* The Honorable Russell E. Smith, Senior United States District Judge for the District of Montana, sitting by designation.

NORRIS, Circuit Judge:

The principal issue in this case is whether witness statements given under a promise of confidentiality to an Air Force aircrash investigation board are exempt from the mandatory disclosure provisions of the Freedom of Information Act (FOIA), 5 U.S.C. § 552. The district court held that the government was authorized to withhold the documents by Exemption 5 of the FOIA, 5 U.S.C. § 552(b)(5),[1] and by traditional equity principles. We reverse and remand.

## I. BACKGROUND

Captain Richard Hoover sustained serious injuries when he ejected from an Air Force airplane after the engine had failed. Under Air Force regulations governing inquiries into significant air crashes, the Air Force performed two investigations. A "collateral investigation" was conducted "to preserve available evidence for use in claims, litigation, disciplinary actions, administrative proceedings, and all other purposes." A.F. Reg. 110–14 ¶ 1(a) (July 18, 1977).[2] A "safety investigation," on the other hand, was conducted by a specially appointed Mishap Investigation Board, which produced a Mishap Report, a "privileged document" intended for "the sole purpose of taking corrective action in the interest of accident prevention." A.F. Reg. 127–4 ¶ 19(a)(1) (Jan. 1, 1973).[3]

Hoover sued designers of various parts of his parachute pack and harness assembly including Weber Aircraft Corporation (Weber), the initial designer, and Mills Manufacturing Corporation (Mills), the manufacturer of the canopy. After the suit was filed, Weber and Mills requested copies of all Air Force investigation reports pertaining to the accident. In response, the Air Force released the complete record of the collateral investigation and what the Air Force termed the factual portions of the Mishap Report, but withheld a number of documents, claiming they were exempt from mandatory disclosure under Exemption 5.

Weber and Mills then filed this action under the FOIA, seeking an injunction requiring the Air Force to disclose the withheld portions of the Mishap Report. The district court denied the injunction and granted the government's motion for summary judgment. On appeal, Weber and Mills claim the district court erred in not compelling production of (1) the witness statements of Captain Hoover and Airman

1. According to 5 U.S.C. § 552(b)(5), "[the FOIA] does not apply to matters that are ... inter-agency or intra-agency memorandums or letters which would not be available by law to a party other than an agency in litigation with the agency."

2. The Air Force pursued the collateral investigation under A.F. Reg. 110–14 (Nov. 1, 1973), the predecessor to A.F. Reg. 110–14 (July 18, 1877). *See also* A.F. Reg. 127–4 ¶ 19(b) (Jan. 1, 1973) ("The Commander ... will ... direct a collateral investigation under AFR 110–14 ....").

3. A.F. Reg. 127–4 ¶ 19(a)(3) (Jan. 1, 1973) states, in part: "These reports and their attachments will not be released to the Department of Justice, any United States attorney, or any other person for litigation purposes in any legal proceeding, civil or criminal, except as stated in (4) below. These prohibitions include any action by or against the United States. These reports and their attachments will be used solely within the USAF and will not be appended to nor enclosed in any report or document, includ-

ing reports of claims investigations, unless the sole purpose of the other reports or documents is to prevent accidents."

A.F. Reg. 127–4 ¶ 19(a)(4) (Jan. 1, 1973) states: "Notwithstanding the restrictions on use of these reports and their attachments and the prohibitions in this regulation against their release, factual material included in accident/incident reports, covering examination of wreckage, photographs, plotting charts, wreckage diagrams, maps, transcripts of air traffic communications, weather reports, maintenance records, crew qualifications, and like nonpersonal evidence may be released as required by law or pursuant to court order or upon specific authorization of The Judge Advocate General after consultation with The Inspector General. Also, Federal law requires that an accused in a trial by court-martial will, upon proper court order, be furnished all statements sworn or unsworn in any form which have been given to any Federal agent, employee, investigating officer, or board by any witness who testifies against the accused."

Dickson,[4] and (2) the withheld portions of medical reports submitted to the Mishap Board.

## II. EXEMPTION 5

### A. *The Witness Statements*

The first issue is whether Exemption 5 permits the government to withhold statements of military personnel given under a promise of confidentiality to an Air Force accident investigation board. This is an issue of first impression in the Ninth Circuit.

Exemption 5 protects "intra-agency memorandums or letters which would not be available by law to a party . . . in litigation with the agency." The documents here are clearly intra-agency memoranda.[5] The issue is how broadly we should construe the phrase "not . . . available by law." In *EPA v. Mink,* 410 U.S. 73, 93 S.Ct. 827, 35 L.Ed.2d 119 (1973), the Supreme Court left open the possibility that Exemption 5 might incorporate all civil litigation privileges: "Exemption 5 contemplates that the public's access to internal memoranda will be governed by the same flexible, common-sense approach that has long governed private parties' discovery of such documents involved in litigation with Government agencies." *Id.* at 91, 93 S.Ct. at 837. More recently, however, the Court noted that "it is not clear that Exemption 5 was intended to incorporate every privilege known to civil discovery." *Federal Open Market Committee v. Merrill,* 443 U.S. 340, 354, 99 S.Ct. 2800, 2809, 61 L.Ed.2d 587 (1979). Because the Court developed a new analysis of the interplay between Exemption 5 and civil litigation privileges, we now consider *Merrill* and its implications.

### 1. *The* Merrill *analysis.*

In *Merrill,* the Federal Open Market Committee (Committee) sought nondisclosure of certain monetary policy directives for the month during which they were in effect. The government first argued broadly that "Exemption 5 confers general authority upon an agency to delay disclosure of intra-agency memoranda that would undermine the effectiveness of the agency's policy if released immediately." 443 U.S. at 353, 99 S.Ct. at 2808. The Court flatly rejected that contention, *id.,* emphasizing that the government must rest its claim "on a privilege enjoyed by the Government in the civil discovery context," *id.* at 354, 99 S.Ct. at 2809.

The Court then agreed with the government's contention that the Committee's monetary policy directives could plausibly be shielded from civil discovery by a qualified privilege for confidential commercial information. *Id.* at 355–56, 99 S.Ct. at 2809–2810. At the same time, the Court stressed that Exemption 5 should not be construed to incorporate all civil litigation privileges. *Id.* at 354, 99 S.Ct. at 2809. Noting that the legislative history to Exemption 5 "expressly mentioned" two privileges—attorney work product and the executive privilege for predecisional deliberations—the Court warned that a claim that Exemption 5 incorporates any other privilege "must be viewed with caution." *Id.* at 355, 99 S.Ct. at 2809. The Court then considered whether Exemption 5 incorporates any other civil discovery privilege, specifically the privilege for confidential commercial information.

The Court in *Merrill* first reviewed the legislative history of the FOIA for evidence that Congress intended to incorporate this specific privilege into Exemption 5. The

---

**4.** Airman Dickson testified about his involvement in rigging the malfunctioning survival kit and automatic deployment assembly of Hoover's parachute.

**5.** Appellants cite *Temple-Eastex, Inc. v. NLRB,* 410 F.Supp. 183, 185 (E.D. Tex. 1976), for the proposition that sworn statements are not inter-agency or intra-agency memoranda under Exemption 5. The present case, however, unlike *Temple-Eastex,* involves statements by government employees. Captain Weber and Airman Dickson were employed by the Air Force when they gave their statements. Their status can thus be measured by "the simplest measure of who is 'within' an agency: the payroll." *County of Madison v. United States Department of Justice,* 641 F.2d 1036, 1040 (1st Cir. 1981).

Court found evidence in the House Report on the FOIA, H.R. Rep. No. 1497, 89th Cong., 2d Sess. 10 (1966), that Congress "specifically contemplated a limited privilege for confidential commercial information." 443 U.S. at 359, 99 S.Ct. at 2811. As we read *Merrill,* this finding is the linchpin of the Court's analysis: Exemption 5 embraces only those civil discovery privileges explicitly recognized in the legislative history. Justice Stevens, in dissent, stated without rebuttal that the Court "proposes . . . that only those privileges that are recognized in the legislative history of FOIA should be incorporated in the Exemption." *Id.* at 366 n. 2, 99 S.Ct. at 2815 n. 2 (Stevens, J., dissenting).

The *Merrill* opinion went on to determine whether incorporating into Exemption 5 a qualified civil-litigation privilege for confidential commercial information would substantially duplicate the effect of any other FOIA exemption. *Id.* at 360, 99 S.Ct. at 2812. We think it clear, however, that the Court would not have undertaken this second step in its analysis unless it had first determined from the legislative history that Congress specifically intended Exemption 5 to encompass the privilege for confidential commercial information.

2. *Brockway and* Cooper.

Before the Supreme Court decided *Merrill,* the Fifth and Eighth Circuits held that Exemption 5 permits nondisclosure of witness statements given to military aircraft investigation boards under a promise of confidentiality. *Cooper v. Department of the Navy,* 558 F.2d 274, 278–79 (5th Cir. 1977), *modified on other grounds,* 594 F.2d 484, *cert. denied,* 444 U.S. 926, 100 S.Ct. 266, 62 L.Ed.2d 183 (1979); *Brockway v. Department of the Air Force,* 518 F.2d 1184, 1193 (8th Cir. 1975). The Air Force relies heavily on these cases as precedent for nondisclosure of the witness statements.

Both courts held that, because Exemption 5 protects information unavailable "by law," the exemption incorporates the civil-

discovery privilege found in *Machin v. Zuckert,* 316 F.2d 336 (D.C. Cir.), *cert. denied,* 375 U.S. 896, 84 S.Ct. 172, 11 L.Ed.2d 124 (1963). *Brockway,* 518 F.2d at 1190–91; *see Cooper,* 558 F.2d at 277. *Machin* held that the Air Force was privileged from disclosing in civil discovery statements given to a military accident investigation board under a promise of confidentiality. 316 F.2d at 339. In *Machin,* the D.C. Circuit had expressed concern that disclosure in civil litigation discovery would "hamper the efficient operation of an important Government program and perhaps even . . . impair the national security by weakening a branch of the military." *Id.* Reasoning that incorporation of the *Machin* privilege into Exemption 5 would serve the purposes of that exemption, and protect the military's "deliberative processes," the *Cooper* and *Brockway* courts both concluded that Exemption 5 incorporates that privilege. 558 F.2d at 277; 518 F.2d at 1194.

3. Merrill *Applied.*

Guided by the *Merrill* analysis, we now consider whether the *Brockway* and *Cooper* courts were correct in concluding that Exemption 5 incorporates the *Machin* privilege, which the Supreme Court termed the executive "privilege for 'official government information' whose disclosure would be harmful to the public interest." *Merrill,* 443 U.S. at 355 n. 17, 99 S.Ct. at 2810 n. 17.[6]

For purposes of our analysis, we assume that the witness statements here would be shielded from civil discovery under the *Machin* privilege. *See Machin,* 316 F.2d at 339; *see also Merrill,* 443 U.S. at 355 n. 17, 99 S.Ct. at 2810 n. 17. We therefore apply the *Merrill* analysis to determine whether Congress intended Exemption 5 to protect factual material shielded from civil discovery by the *Machin* privilege.

The critical step in the *Merrill* analysis involves a search of the FOIA legislative history for evidence that Congress intended Exemption 5 to incorporate an executive

---

**6.** The Supreme Court in *Merrill* expressly left open the question whether Exemption 5 incor-

porates this privilege. 443 U.S. at 355 n. 17, 99 S.Ct. at 2810 n. 17.

privilege for "official government information." Our search convinces us that neither House of Congress intended Exemption 5 to incorporate an executive privilege that protects purely factual material. Indeed, the Senate Report assumes that Exemption 5 would protect only "legal or policy matters." S. Rep. No. 813, 89th Cong., 1st Sess. 9 (1965). Moreover, the legislative history suggests that Congress intended Exemption 5 to encompass factual material which is "inextricably intertwined" with legal or policy matters, but not to protect "memoranda consisting only of compiled factual material or purely factual material contained in deliberative memoranda and severable from its context." *EPA v. Mink*, 410 U.S. 73, 87–88, 93 S.Ct. 827, 836, 35 L.Ed.2d 119 (1973).[7]

The Eighth Circuit in *Brockway* acknowledged the language of the Senate Report, but found such evidence of legislative intent unconvincing: "The House Report . . . is not as explicit in limiting Exemption 5 to only legal or policy matters . . . ." 518 F.2d at 1190. We disagree. Although the House Report is somewhat ambiguous,[8] it does contain evidence that Exemption 5 was meant to protect only "advice from staff assistants and the exchange of ideas among

agency personnel." H. Rep. No. 1497, 89th Cong., 2d Sess. 10 (1966).

Thus both the Senate and House Reports contain evidence that Congress intended Exemption 5 to incorporate an executive privilege of limited scope, protecting "legal or policy matters" or "advice . . . and exchange of ideas."[9] But we find no evidence in the legislative history that Congress intended Exemption 5 to protect witness statements given under a promise of confidentiality.

The legislative scheme of the FOIA, viewed as a whole, supports this reading of the House and Senate Reports. Congress enacted the FOIA to replace parts of the Administrative Procedure Act which, although designed to require disclosure of government information, "ha[d] been used as an authority for withholding, rather than disclosing, information." H. Rep. No. 1497, 89th Cong., 2d Sess. 4 (1966). The old law had permitted executive agencies to withhold information on the bare assertion that disclosure would not be in " 'the public interest.' " *Id.* at 5. The lack of guidelines in the old law led to abuse, because "[n]o Government employee at any level believes that the 'public interest' would be served by

**7.** A previous bill contained an exemption for " 'inter-agency or intra-agency memorandums or letters *dealing solely with matters of law or policy.*' " *EPA v. Mink*, 410 U.S. 73, 90, 93 S.Ct. 827, 837, 35 L.Ed.2d 119 (1973) (quoting S. 1160, 89th Cong., 1st. Sess. (1965)). This formulation was severely criticized for permitting "compelled disclosure of an otherwise private document simply because the document did not deal 'solely' with legal or policy matters. . . . As a result of this criticism, Exemption 5 was changed to substantially its present form." *Id.* at 90–91, 93 S.Ct. at 837. The change was not intended to weaken the factual-deliberative distinction, however, "but to assure that factual material inextricably intertwined with deliberative material would also be exempt." *Robbins Tire & Rubber Co. v. NLRB*, 563 F.2d 724, 735 (5th Cir. 1977), *rev'd on other grounds*, 437 U.S. 214, 98 S.Ct. 2311, 57 L.Ed.2d 159 (1978).

**8.** The House Report speaks broadly of protecting the secrecy of "documents or information which [a government agency] has received." H. Rep. No. 1497, 89th Cong., 2d Sess. 10 (1966).

**9.** Indeed, the Supreme Court's conception of Exemption 5 has consistently reflected this legislative history. *See, e.g., FBI v. Abramson*, — U.S. —, —, 102 S.Ct. 2054, 2064, 72 L.Ed.2d 376 (1982) (the purpose of Exemption 5 is "protecting the give-and-take of the decisional process"); *EPA v. Mink*, 410 U.S. 73, 89, 93 S.Ct. 827, 836, 35 L.Ed.2d 119 (1973) ("Virtually all of the courts that have thus far applied Exemption 5 have recognized that it requires different treatment for materials reflecting deliberative or policy-making processes on the one hand, and purely factual, investigative matters on the other."); *see also Brockway*, 518 F.2d at 1190 ("In defining the scope of Exemption 5, most courts have held that the exemption generally operates to protect 'internal communications consisting of advice, recommendations, opinions, and other material reflecting deliberative or policy-making processes, but not purely factual or investigatory reports.' ") (quoting *Soucie v. David*, 448 F.2d 1067, 1077 (D.C. Cir. 1971)).

disclosure of his failures or wrongdoings." *Id.* at 9. Congress's purpose in enacting the FOIA was to curtail this abuse. *See id.* at 3–6; S. Rep. No. 813, 89th Cong., 1st Sess. 3 (1965). The Senate and House Reports accordingly agreed "that all *materials* of the Government are to be made available to the public ... unless explicitly allowed to be kept secret by one of the exemptions." S. Rep. No. 813, 89th Cong., 1st Sess. 10 (1965); *see* H. Rep. No. 1497, 89th Cong., 2d Sess. 11 (1966). Further, the Senate Report expressly states that the Committee "attempted to delimit [Exemption 5] as narrowly as consistent with efficient Government operation." S. Rep. No. 813, 89th Cong., 1st Sess. 9 (1965).

A decision that Exemption 5 incorporates the *Machin* civil discovery privilege for official government information would be inconsistent with the legislative mandate to "delimit" the exemption narrowly. We believe the *Machin* privilege exceeds the scope Congress envisioned for Exemption 5. The *Machin* privilege protects statements of ministerial reporters of fact as well as of decisionmakers, and permits the government to shroud investigative reports in secrecy. We therefore conclude that the legislative history to the FOIA reveals no evidence that Congress intended Exemption 5 to encompass the *Machin* civil-discovery privilege for official government information.[10]

To decide that the FOIA authorizes the government to withhold the witness statements at issue, we would have to amend the FOIA judicially. This we are unwilling to do. Opening up the FOIA to broad judicial interpretation would bring us full circle, creating the very evil Congress sought to avoid when it passed the FOIA, and "suggest[ing] no principled manner in which to confine FOIA's scope." *County of Madison v. United States Department of Justice,* 641 F.2d 1036, 1040 (1st Cir. 1981).

We hold that Exemption 5 does not incorporate the *Machin* civil-discovery privilege for official government information. However, because Exemption 5 does incorporate the executive privilege for predecisional deliberations, we hold that the Air Force may withhold any "reasonably segregable" portion of the witness statements containing advice, opinions or recommendations, *see* 5 U.S.C. § 552(b), but must disclose any factual portion of the witness statements at issue. On remand, the district court must determine which portions, if any, contain advice, opinion or recommendations which the government may withhold from disclosure.

### B. The Medical Report

The next issue is whether Exemption 5 protects "[a] one-page internal Air Force letter ... [which] discusses the *findings* and recommendations of the life sciences member of the aircraft accident investigation board and contains further recommendations with regard to safety actions that should be considered for adoption by the Air Force." Affidavit of Major General Harold R. Vague, Judge Advocate General, United States Air Force (JAG) (emphasis added). Relying on the JAG's affidavit, *see EPA v. Mink,* 410 U.S. 73, 93, 93 S.Ct. 827, 838, 35 L.Ed.2d 119 (1973) (district court may rely on affidavits to determine content of documents); *Church of Scientology v. United States Department of the Army,* 611 F.2d 738, 742 (9th Cir. 1979) (same), the district court found that the one-page medical report contains "opinions, conclusions, and speculations," *Weber Aircraft Corp. v. United States,* No. CV 79–2883, slip op. at 5 (C.D. Cal. Aug. 15, 1980) (unpublished findings of fact and conclusions of law), and authorized the Air Force to withhold the report.

---

**10.** Exemption 5 is the only FOIA exemption properly before us on this appeal. We have already noted that the second step of the *Merrill* analysis—whether incorporating a particular civil discovery privilege into Exemption 5 would substantially duplicate the coverage of another exemption—is unnecessary when a court determines, as we have here, that the legislature did not intend to incorporate the privilege into Exemption 5. *See* part II A. 1., *supra.*

■ It is unclear from the face of the affidavit what the JAG meant when he stated that the letter discusses the life science member's "findings." To the extent the "findings" constitute factual reporting, they are not covered by Exemption 5. To the extent the "findings" constitute "opinions, conclusions and speculations" forming the basis of recommendations, they are protected by Exemption 5. As we are unable to determine whether the district court had this distinction in mind when it reviewed the affidavit, we remand for reconsideration of the medical report in light of this opinion.

## III. TRADITIONAL EQUITY PRINCIPLES

As an alternative ground for its summary judgment in favor of the government, the district court held that "[t]he 'public interest,' which is the 'primary consideration' in balancing the equities, is best served by non-disclosure of the documents.... Thus, using 'traditional equity principles,' the balance here is clearly in favor of the defendant and non-disclosure of the documents." *Id.* at 4. The government argues that the district court correctly concluded that it may exercise its broad traditional equity powers to permit nondisclosure of documents not protected by a specific FOIA exemption.

The language and legislative history of the FOIA refute the government's position. To the contrary, the language of the FOIA forbids the government to withhold information under the Act "except as specifically stated in [the FOIA]." 5 U.S.C. § 552(c); *see EPA v. Mink,* 410 U.S. at 79, 93 S.Ct. at 832 (FOIA exemptions "are explicitly made exclusive"). A court's exercise of its general equity powers is therefore repugnant

to the FOIA's overriding purpose, "to establish a general philosophy of full agency disclosure unless information is exempted under clearly delineated statutory language." S. Rep. No. 813, 89th Cong., 1st Sess. 3 (1965); *accord County of Madison v. United States Department of Justice,* 641 F.2d 1036, 1041 (1st Cir. 1981); *Soucie v. David,* 448 F.2d 1067, 1077 (D.C. Cir. 1971) ("We are persuaded that Congress did not intend to confer on district courts a general power to deny relief on equitable grounds apart from the exemptions in the Act itself.").

Further, the legislative history of the FOIA demonstrates Congress' intent to restrict judicial discretion. "It is essential that agency personnel, *and the courts as well,* be given definitive guidelines in setting information policies.... Success lies in providing a workable formula which encompasses, balances, and protects all interests, yet places emphasis on the fullest responsible disclosure." S. Rep. No. 813, 89th Cong., 1st Sess. 10 (1965) (emphasis added);[11] *see EPA v. Mink,* 410 U.S. 73, 80, 93 S.Ct. 827, 832, 35 L.Ed.2d 119 (1973); *Soucie v. David,* 448 F.2d 1067, 1077 n. 39 (D.C. Cir. 1971). The careful balancing of interests which Congress attempted to achieve in the FOIA would be upset if courts could exercise their general equity powers to authorize nondisclosure of material not covered by a specific exemption. *Id.* at 1077. We thus conclude that, in enacting the FOIA, Congress did not intend to leave district courts with authority to use their broad traditional equity powers to permit government agencies to withhold information.

■ We further conclude that the government's reliance on language in *Theriault v. United States,* 503 F.2d 390 (9th Cir.

---

11. While the language of the Senate Report is unequivocal, the House Report raises some questions, stating that a court "will have authority whenever it considers such action equitable and appropriate to enjoin the agency from withholding its records and to order the production of agency records improperly withheld." H. Rep. No. 1497, 89th Cong., 2d Sess. 9 (1966). We nonetheless find this language unhelpful to the government's cause. Nowhere is

there any indication that a court may exercise broad equity powers to authorize *non*disclosure. Indeed, that would directly contradict Congress' purpose in enacting the FOIA, "to make clear beyond doubt that all materials of Government are to be available to the public unless specifically exempt from disclosure." *Id.* at 11. *See generally* Project, *Government Information and the Rights of Citizens,* 73 Mich. L. Rev. 971, 1150–56 (1975).

1974), is misplaced. In *Theriault,* we stated: " 'In exercising the equity jurisdiction conferred by the Freedom of Information Act, the court must weigh the effects of disclosure and nondisclosure, according to traditional equity principles.' " *Id.* at 392 (quoting *General Services Administration v. Benson,* 415 F.2d 878, 880 (9th Cir. 1969)). The government argues that this language authorized the district court to exercise its broad traditional equity powers in the case now before us. The government's interpretation of *Theriault,* however, ignores other qualifying language in the opinion indicating that district courts may use their equity powers to authorize nondisclosure under the FOIA only when "dire adverse potentialities" would result. 503 F.2d at 392 (citing *Rose v. Department of the Air Force,* 495 F.2d 261, 269 (2d Cir. 1974), (the judiciary may use its equity power in "a truly exceptional case." ), *aff'd on other grounds,* 425 U.S. 352, 96 S.Ct. 1592, 48 L.Ed.2d 11 (1976)); *see also Halperin v. Department of State,* 565 F.2d 699, 706 (D.C. Cir. 1977) (courts are left with "some discretion in extreme circumstances" to use their equity powers to avoid disclosure of government information which would "do grave damage to the national security"). Moreover, the government's expansive reading of *Theriault* would result in nondisclosure of documents on a bare "public interest" rationale, *see, e.g., Theriault v. United States,* 395 F.Supp. 637, 642 (C.D. Cal. 1975), despite the Supreme Court's recent admonition that Congress repeatedly rejected "any interpretation of the FOIA which would allow an agency to withhold information on the basis of some vague 'public interest' standard." *Federal Open Market Committee v. Merrill,* 443 U.S. 340, 354, 99 S.Ct. 2800, 2809, 61 L.Ed.2d 587 (1979). In light of *Merrill,* we conclude that *Theriault* must be read narrowly to mean that courts may use their equity power under the FOIA to authorize nondisclosure of information only in "extreme" or "exceptional" circumstances.

In the case now before us, however, the circumstances are neither "extreme" [12] nor "exceptional." We are hardly dealing with extremely sensitive information such as military secrets or troop movements. The government does not claim that disclosure of the factual portions of the witness statements will cause immediate and irreparable harm to the public interest. Rather the government's concern is that future aircraft accident investigations will be seriously impaired if the military cannot assure witnesses that their statements will be held in confidence. If that in fact proves to be the case, the Air Force should look for a solution to its problem in new legislation, not judicial improvisation. *See United States v. Olympic Radio & Television, Inc.,* 349 U.S. 232, 236, 75 S.Ct. 733, 736, 99 L.Ed. 1024 (1955). The government can make its case to Congress that confidentiality of witness statements is critical to the Air Force's longterm ability to obtain information in accident investigations. Only Congress can properly balance the Air Force's claim of future need against the public's interest in maximum disclosure of government information. The judiciary can at best speculate. *See, e.g., Cooper,* 558 F.2d at 277 (relying on the Air Force's conclusory affidavit and "common sense" for its conclusion that incorporating the *Machin* civil discovery privilege into Exemption 5 was necessary to protect the Air Force's "decisional processes"); *see also Brockway,* 518 F.2d at 1194 (speculating that disclosure would result in "the definite possibility that the deliberative processes of the Air Force will be hampered."). Congress has given continued attention to the FOIA, amending it to conform to the legislative will; judicial amendments are both unnecessary and inappropriate. *See* Project, *Government Information and the Rights of Citizens,* 73 Mich. L. Rev. 971, 1156 n. 1131 (1975).

REVERSED AND REMANDED for further proceedings consistent with this opinion.

---

12. The government has offered no record support for its conclusory argument that shielding the witness statements at issue would "safeguard the lives of flight crews, enhance the safety of those upon whom aircraft might otherwise fall, and contribute to the national defense." Appellee's brief at 11.

RUSSELL E. SMITH, Senior District Judge, dissenting.

I dissent.

We deal here with the lives of the persons who fly military aircraft. The Air Force asserts a privilege which it considers essential to its air safety program. The district court sustained the privilege and found on evidence that there was a substantial need for the nondisclosure policy.[1]

In *Machin v. Zuckert,* 316 F.2d 336 (D.C. Cir.), *cert. denied,* 375 U.S. 896, 84 S.Ct. 172, 11 L.Ed.2d 124 (1963), which was decided before the enactment of the FOIA, a privilege was found to exist as to statements given to the Air Force under promises that the statements would be held confidential. Following the enactment of the FOIA, the Fifth and Eighth Circuits, in *Cooper v. Department of the Navy,* 558 F.2d 274, *cert. denied,* 444 U.S. 926, 100 S.Ct. 266, 62 L.Ed.2d 183 (1977), and *Brockway v. Department of the Air Force,* 518 F.2d 1184 (1975), relied on *Machin* and, notwithstanding the FOIA, recognized the identical privilege asserted here.

The Supreme Court in *Federal Open Market Committee v. Merrill,* 443 U.S. 340, 99 S.Ct. 2800, 61 L.Ed.2d 587 (1979), did not decide the exact question presented here, nor did it decide whether the privilege announced in *Machin* survived the enactment of the FOIA. In *Merrill* the Court said:

The two other privileges advanced by the FOMC are a privilege for "official government information" whose disclosure would be harmful to the public interest, see *Machin v. Zuckert,* 114 U.S. App. D.C. 335, 338, 316 F.2d 336, 339, cert. denied, 375 U.S. 896 [84 S.Ct. 172, 11 L.Ed.2d 124] (1963), and a privilege based on Fed. Rule Civ. Proc. 26(c)(2), which permits a court to order that discovery "may be had only on specified terms and conditions, including a designation of the time or place." In light of our disposition of this case, we do not consider whether either asserted privilege is incorporated in Exemption 5.

443 U.S. at 355–56, n. 17, 99 S.Ct. at 2809–2810, n. 17. In view of the quoted language, I do not think it can be said that *Merrill* constitutes a repudiation, *sub silentio,* of *Cooper* and *Brockway.* I believe those cases to be sound, and I would follow them and affirm.

---

**1.** *See Cooper v. Department of the Navy,* 558 F.2d 274, 276 (1977), *cert. denied,* 444 U.S. 926, 100 S.Ct. 266, 62 L.Ed.2d 183 (1977).